[No. C065505. Third Dist. May 10, 2011.]

JOHNNY R. RIBEIRO, Plaintiff and Respondent, v.
COUNTY OF EL DORADO, Defendant and Appellant.

**COUNSEL**

Mason • Thomas and Stephen A. Mason for Defendant and Appellant.

Banks & Watson, James J. Banks and Kelsey E. Papst for Plaintiff and Respondent.

**OPINION**

**HOCH, J.**—A jury found in favor of Johnny R. Ribeiro against the County of El Dorado (County), finding Ribeiro had the right to rescind a tax-sale contract and recover his deposit, due to a unilateral mistake of fact caused by the County. The County timely appealed.

On appeal, the County contends the trial court should have granted its motion for a nonsuit because the doctrine of caveat emptor (buyer beware) applies at tax sales, except where displaced by statute, and no statute authorizes Ribeiro's claim.

This appeal requires us to decide whether a purchaser of tax-defaulted property from a public entity at a tax sale is limited to the remedies provided by Revenue and Taxation Code section 3725 et seq.[1] or may also pursue traditional contract remedies.

This issue was debated in three cases. Two cases explain that, according to precedent, caveat emptor applies at tax sales, and absent an explicit statutory remedy, the buyer has no remedy. (*Van Petten v. County of San Diego* (1995) 38 Cal.App.4th 43 [44 Cal.Rptr.2d 816] (*Van Petten*); *Craland, Inc. v. State of California* (1989) 214 Cal.App.3d 1400 [263 Cal.Rptr. 255] (*Craland*).) One

---

[1] Undesignated section references are to the Revenue and Taxation Code.

case, in a split decision, concluded that because the Revenue and Taxation Code does not state its remedies are exclusive, the contractual remedy of rescission is available. (*Schultz v. County of Contra Costa* (1984) 157 Cal.App.3d 242 [203 Cal.Rptr. 760] (*Schultz*).) The trial court overruled a demurrer and denied a summary judgment motion, concluding that *Schultz* was correctly decided. The trial court denied the County's motion for nonsuit for the same reason.

We hold that the statutory remedies are exclusive at tax sales and reject *Schultz*. We reverse with directions to the trial court to enter judgment for the County.

## FACTUAL AND PROCEDURAL BACKGROUND

Because the County seeks review of the denial of its motion for a nonsuit, we must resolve all factual disputes in favor of Ribeiro. (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948].)

We grant Ribeiro's unopposed motion for judicial notice of legislative history documents. However, taking judicial notice of such documents does not mean they will be helpful in resolving a given interpretive question. (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 29–30 [34 Cal.Rptr.3d 520].)

Ribeiro, an experienced real estate investor, placed the winning bid at a tax sale on "Parcel 32," which was subject to assessments authorized by the Improvement Bond Act of 1915 (Sts. & Hy. Code, § 8500 et seq.) (1915 bonds). Ribeiro did not know the amount of 1915 bond arrearages, but assumed it was "most likely" around $250,000. When he learned the amount of bond arrearages was $2.7 million, he refused to complete the sale and sued the County to recover his deposit.

The defense theory at trial was that Ribeiro did not conduct a thorough title search, which would have revealed the 1915 bond amounts, and Ribeiro's theory was that the County's failure to record notice of stripping the 1915 bonds from the tax roll, and the County's failure to provide information about the 1915 bonds on request, concealed those assessments from the diligent title search he conducted.

The County had previously billed 1915 bond assessments separately from property taxes, but in the 1990's combined them into one bill. Ribeiro knew that the procedure for collecting delinquencies differed: Delinquent property

taxes would lead to a tax sale, but delinquent 1915 bond assessments would be stripped from the tax roll and collected by a foreclosure action.

According to a legislative report tendered by Ribeiro, Streets and Highways Code section 8833 was amended in 1996 to require recorded notice when 1915 bonds or other assessments are stripped from the tax roll, to reduce litigation against title companies over unknown assessments. (Stats. 1996, ch. 625, § 3, pp. 3459–3461; see Sen. Rules Com. Off. of Sen. Floor Analyses, Rep. on Sen. Bill No. 1471 (1995–1996 Reg. Sess.) Aug. 21, 1996, pp. 2–3.) It was undisputed at trial that County officials were ignorant of this duty and failed to record such notice. However, the notice would not have included the amount of the 1915 bonds stripped, only the "specific tax year and installment intended to be removed" and other general information about the property. (See Sts. & Hy. Code, § 8833, subd. (b)(1)–(5).)

Taxes and 1915 bond assessments for Parcel 32, in the El Dorado Hills Business Park, were delinquent. Ribeiro testified he knew the El Dorado Hills Business Park "was an assessment district that had 1915 bonds on it," some of which were paid up and some of which were not, and he owned four or five parcels in that district. In 2004, he learned Parcel 32 was for sale and "had not had its taxes paid for quite some time and the owners were in default."

Parcel 32 was on a tax-sale list dated October 8, 2004, with an "opening price" of $814,000, and a document from the tax collector showed about $560,000 was owed for property taxes. Ribeiro wanted to know the reason for this discrepancy, but the assessor's office and the auditor-controller's office referred him back to the tax collector, and would not confirm whether the 1915 bond arrearages explained the discrepancy between the tax arrearages and the opening bid price. Ribeiro researched recorded documents and obtained a preliminary title report, but these documents did not explain the discrepancy.

On October 21, 2004, Ribeiro obtained an online tax printout for Parcel 32, showing a total of $583,626.60 in taxes due, divided into a "Redemption" or "Default" amount of $564,531.14, and a "Secured" current-year amount of $19,095.46. The first page states at the bottom, partly in boldface: "**There is a 1915 [bond] Special Assessment or Mello-Roos CFD Special Tax included on the Secured Tax bill on this parcel.** [¶] Tax Class 20570 . . . 1915-EDH BUSINESS PARK PHASE I." Ribeiro testified he thought this meant 1915 bond assessments were included in the secured tax amount. His employee, Angela Gholar, spoke with someone at the title company who confirmed this belief, which she conveyed to Ribeiro. However, the document did not indicate that 1915 bond arrearages were included.

The title report had an exception for a lawsuit that Ribeiro knew was an action to foreclose on 1915 bonds. Ribeiro's attorney found the action had been dismissed without prejudice in 1995, and Ribeiro knew this meant the 1915 bonds were in arrears and that the foreclosure action could be refiled. At the tax sale, the auctioneer said the property was in foreclosure, but Ribeiro did not believe it was.

Gholar obtained a copy of the auction rules online. They provided for delivery of clear title with several exceptions, including exception (f), for "[u]npaid assessments under [1915 bonds] that are not satisfied as a result of the sale proceeds being applied." "[B]asically identical" rules were distributed at the auction. The exceptions were taken verbatim from the Revenue and Taxation Code. (See § 3712, subd. (f).) An employee of the tax collector testified she understood exception (f) to mean that there might or might not be 1915 bonds not satisfied by the sale proceeds. Thus, contrary to an assertion by Ribeiro on appeal, she did not confirm his explanation for the discrepancy between the opening price and the unpaid taxes. At trial, Ribeiro testified he thought the rules meant "the special assessments would not be cleared due to the tax sale. It would still be an encumbrance if there's any outstanding amount still owing."

The evidence was in conflict about whether the auditor-controller's office was closed during the auction and whether County employees answered questions about 1915 bond arrearages before the auction. The County repeatedly states on appeal that the 1915 bond arrearages were available through the auditor-controller's office, but in reviewing the denial of a nonsuit, we must presume County employees did not reveal those arrearages on request.

Ribeiro testified he knew there were unpaid 1915 bonds, but not the amount, and he assumed the amount was the difference between the auction price of $814,000 and the tax owed of about $560,000. He conceded that no County employee ever told him this was so. He knew he was bidding based on incomplete information.

Ribeiro testified that at the November 5, 2004, tax sale, the auctioneer "stated it was buyer beware and . . . this property was subject to 1915 bonds." He was the successful bidder, and he signed a credit sale agreement that day. It stated a price of $834,917.40, called for a 10 percent deposit, rounded to $83,400, and required the balance to be paid by December 6. It also provided that failure to pay the balance "will result in the forfeiture of the deposit and all rights I may have with respect to the subject property." Ribeiro paid the deposit.

On December 2, 2004, Ribeiro received an auditor-controller document dated October 18, 2004, showing 1915 bond arrearages of $2.7 million for

Parcel 32. Had he known this amount, he would not have bid on Parcel 32, because it "made the property economically unviable."

The trial court instructed on fraud and unilateral mistake of fact. For mistake, Ribeiro had to prove he was not grossly negligent and the County knew or caused the mistake to its own advantage or that enforcement of the contract would be unconscionable. The County unsuccessfully objected to an instruction on its duty to record notice of stripping 1915 bonds from the tax roll. We note the jury was instructed on section 3692.3, providing for "as is" tax sales, and the County mentions this statute on appeal. But this statute took effect on January 1, 2005, after the sale in question (Stats. 2004, ch. 194, § 15; Gov. Code, § 9600, subd. (a)) and therefore has no application in this case. However, in light of the verdict, we need not address this point further.

Ribeiro argued to the jury that County officials did not record the notice of intent to strip the 1915 bonds from the tax roll, that County employees should have provided the 1915 bond arrearages, that Ribeiro took all reasonable steps to learn the 1915 bond information, and that he reasonably thought the 1915 bond arrearages would account for the discrepancy between the delinquent taxes and the opening bid price. He conceded "buyer beware" applied to the tax sale, but argued the buyer cannot know things that have not been recorded.

The County argued to the jury that "buyer beware" means just that, and that Ribeiro made an incorrect assumption, as he testified, that the amount was the difference between the unpaid taxes and the opening bid price. The County also argued that a recorded notice of intent to strip the bonds from the tax roll would not have revealed the amount of the bonds, and that Ribeiro was reckless in making his bid, knowing he did not know the amount of the bonds.

The jury rejected Ribeiro's fraud theory, finding the County did not intend to deceive Ribeiro, but found the County knew of or caused Ribeiro's mistake regarding the amount owed, "to its own advantage," and found the mistake was not caused by Ribeiro's gross negligence. The verdict form did not require a finding about unconscionability, and the jury made no such finding. The jury found Ribeiro was entitled to rescind the contract, and awarded him the amount of his deposit, $83,400. The trial court awarded Ribeiro $45,904 in prejudgment interest.

The County timely filed this appeal from the judgment.

## DISCUSSION

Ribeiro argues that when a dissatisfied buyer at a tax sale cannot invoke statutory remedies specific to tax sales, the buyer may invoke the remedy of rescission due to mistake.

The issue arises because Ribeiro cannot invoke the remedies now provided by the Revenue and Taxation Code. If a court voids a tax deed, or a board of supervisors finds the property should not have been sold, the purchaser may obtain a refund (see §§ 3728–3731). Ribeiro concedes the instant case does not involve a void or improper sale.

Ribeiro builds his argument on three propositions. First, he contends that before 1913, a court would have applied equitable remedies to avoid applying caveat emptor on these facts. Second, he contends legislative changes beginning in 1913 and continuing thereafter reflect an intent to broaden the remedies provided to tax-sale buyers, not "to exclude any remedies which might otherwise be available." Third, he contends *Schultz* properly allowed recovery for mistake, cases predating *Schultz, supra,* 157 Cal.App.3d 243, are distinguishable, and cases disagreeing with *Schultz* "have expanded basic legal principles into a draconian and ultimately incorrect rule of law."

All three propositions fail. Prior to 1913, caveat emptor precluded a dissatisfied buyer at a tax sale from recovering, except as explicitly allowed by statute, and Ribeiro would have had no remedy based on mistake. The fact the Legislature added statutory remedies shows it was aware of the harsh application of caveat emptor, but those statutes only limit caveat emptor, they do not destroy the doctrine. We conclude *Schultz* misread applicable precedent and that only statutory remedies are available to a purchaser at a tax sale.

. I.

### The Nature of Tax Sales

The purpose of a tax sale is to collect unpaid taxes and insure future taxes are paid. "It has been repeatedly held that the return to the tax rolls of property which has been sold for taxes in order that it may again support general governmental functions is in the public interest." (*Anglo Cal. Nat. Bank v. Leland* (1937) 9 Cal.2d 347, 352 [70 P.2d 937]; see *People v. Maxfield* (1947) 30 Cal.2d 485, 487 [183 P.2d 897] [purpose "is not the acquisition of the property but the collection of the taxes"]; *State ex rel. McKenzie v. Casteel* (1887) 110 Ind. 174, 183–185 [11 N.E. 219, 224–225] (*Casteel*).)

Tax-sale hazards are "such that land, when sold for taxes, rarely, if ever, brings its actual value, and its purchase is ordinarily for purposes of speculation." (4 Tiffany, Law of Real Property (3d ed. 1975) Transfer for Nonpayment of Taxes, § 1248, p. 1153; see 2 Bowman, Ogden's Rev. Cal. Real Property Law (Cont.Ed.Bar 1975) Real Property Taxes, § 21.26, pp. 1098–1099 ["long-recognized hazard" prevented insuring titles and courts regarded purchases "as speculative—buying a lawsuit" after sales "with their Pandora's box of irregularities"].)

■ Because tax sales were considered speculative, and because the purpose was to collect taxes, the common law rule was that *"caveat emptor* applies to tax purchases. The purchaser at a tax sale will therefore lose what he has paid if his deed is subject to fatal infirmity. This is the rule unless the statute recognizes an equity in him and provides for it." (2 Cooley, Law of Taxation (3d ed. 1903) Sale of Lands for Unpaid Taxes, p. 1017, fns. omitted; approved by *Holland v. Hotchkiss* (1912) 162 Cal. 366, 374 [123 P. 258] (*Holland*); see 2 Pomeroy, Equity Jurisprudence (5th ed. 1941) § 393a, pp. 77–79 [in part citing *Holland*]; Annot., Void Tax Sale—Reimbursement of Purchaser (1933) 86 A.L.R. 1208 [*Holland* as lead case]; *Foster v. Malberg* (1912) 119 Minn. 168, 172 [137 N.W. 816, 817–818] (*Foster*) [without statute, buyer "without remedy"]; *Casteel, supra,* 110 Ind. at p. 179 [11 N.E. at p. 222].)

II.

Ribeiro Had Knowledge of the Existence of 1915 Bond
Arrearages

Before addressing Ribeiro's three propositions, we first address and resolve two arguments regarding knowledge of the 1915 bond arrearages.

Ribeiro makes the general claim that he had no notice of the 1915 bond arrearages and was a "bona fide" purchaser with "every assurance that the tax sale bid price included all amounts owing," therefore it is "draconian" for him to lose his deposit. We are not persuaded. Ribeiro knew there were 1915 bond arrearages and knew he did not know the amount. No County employee told him his assumption was correct, and even he thought it was "most likely" correct. He knew caveat emptor applied to the tax sale, and was under no compulsion to bid. He stands squarely in the shoes of the many dissatisfied tax-sale buyers preceding him who were denied recovery, because tax sales are highly speculative and are subject to caveat emptor. (See *American Investment Co. v. County of Beadle* (1894) 5 S.D. 410, 415 [59 N.W. 212, 213] ["one who buys land at a tax sale is never a *bona fide* purchaser"].)

This is not a case of fraud. The jury rejected Ribeiro's fraud theory, and no County employee gave him incorrect information. This is not a case where the failure to record a document as required by statute misled a bidder. (See *Foster, supra,* 119 Minn. at p. 174 [137 N.W. at p. 818] [noting possible recovery in such cases].) Although the County did not comply with its duty to record notice of stripping the 1915 bonds from the tax roll, Ribeiro knew the bonds had been stripped, and that he did not know the amount of the bonds. Further, the recorded notice would not have told him the amount. Therefore, contrary to Ribeiro's assertion, the County's failure to record notice played no causal role in Ribeiro's bid.

## III.

### Prior to 1913, the Doctrine of Caveat Emptor Would Have Barred Ribeiro's Claim

Ribeiro cites authorities he claims support his proposition that equity would have been available to a purchaser at a tax sale induced to bid by mistake prior to 1913. However, the authorities he cites discuss foreclosure or judicial sales, private land sales, or implied warranties, *not tax sales. (Quarg v. Scher* (1902) 136 Cal. 406 [69 P. 96] [private sale]; *Webster v. Haworth* (1857) 8 Cal. 21 [sheriff's sale]; *Peardon v. Markley* (1920) 50 Cal.App. 257 [195 P. 70] [private sale]; *Courtney v. Farthing* (1940) 282 Ky. 54 [137 S.W.2d 703] [judicial sale]; *Castleman v. Castleman* (1910) 67 W.Va. 407 [68 S.E. 34] [judicial sale]; *Norton v. Taylor* (1892) 35 Neb. 466 [53 N.W. 481] [judicial sale]; *Hayes v. Stiger* (1878) 29 N.J.Eq. 196 [2 Stewart 196] [judicial sale]; 1 Hunter & Rowley, Modern Law of Contracts (2011) Warranties, § 9.4; cf. *Karoutas v. HomeFed Bank* (1991) 232 Cal.App.3d 767, 775, fn. 11 [283 Cal.Rptr. 809] [noting that unlike nonjudicial foreclosures, tax sales are governed by caveat emptor].)

One cannot assume that exceptions to the doctrine of caveat emptor in one context apply in another. For example, Ribeiro cites Corpus Juris Secundum to show that caveat emptor may be relaxed at *judicial sales* to allow claims of mistake. (50A C.J.S. (2008) Judicial Sales, § 101, pp. 88–90.) But in other sections that encyclopedia states caveat emptor is normally applied at *tax sales,* absent a statutory remedy. (85 C.J.S. (2010) Taxation, § 1554, p. 613; 64A C.J.S. (1999) Municipal Corporations, § 1854, pp. 507–508.)

Prior to 1913, the California Supreme Court held that if a prior owner sued in equity to quiet title based on an invalid tax sale, the owner had to do equity by reimbursing the buyer (see *Campbell v. Canty* (1912) 162 Cal. 382,

384 [123 P. 266]), but a suit by the buyer was subject to the common law doctrine of caveat emptor, unless modified by statute. (*Holland, supra,* 162 Cal. at pp. 373–376.)

Because these common law remedies were extremely narrow, dissatisfied buyers tried to recover under other legal theories. For example, former Political Code section 3804 provided for refunds of "erroneously or illegally collected" taxes. (Code commrs., 2 Ann. Pol. Code (1st ed. 1872, Haymond & Burch, Commrs.-annotators) § 3804, p. 90.) Where a tax-sale buyer could not obtain title due to a defective tax assessment, the California Supreme Court held the Political Code section "does not apply to a case of this kind. There is no rule of law authorizing the plaintiff to recover." (*Loomis v. County of Los Angeles* (1881) 59 Cal. 456, 456–457; see *Brooks v. County of Tulare* (1897) 117 Cal. 465, 468 [49 P. 469] [buyer learned property was not taxable and sought refund; court held he could have learned this before the sale and, "At any rate, his bid was voluntary, and he cannot now maintain an action to recover back the money paid."].)

In another case, property had been taxed twice, therefore the county had "no right or power to sell" it, making the sale void. (*Hayes v. County of Los Angeles* (1893) 99 Cal. 74, 78–79 [33 P. 766] (*Hayes*).) *Hayes* reaffirmed that caveat emptor applies except where displaced by statute, but then ruled that a void sale justified a refund. The California Supreme Court stated: "Section 3804 was enacted to do justice in a class of cases where, but for its provisions, the application of the doctrine of *caveat emptor* would work a hardship to citizens who had paid money which it was inequitable for the county to retain. [¶] [T]he doctrine of *caveat emptor* has no proper application to that class of cases in which the attempted sale of real property for taxes is absolutely void by reason of the tax having been previously paid." (*Id.* at p. 79.)

It is possible, as Ribeiro suggests, that courts were inconsistent about when a sale was *void* and when a *void* sale permitted a refund. Here, there is no claim the tax sale proceedings were void. Therefore, this possible inconsistency in the early cases does not help him.

In an attempt to limit the effect of cases holding that only statutory remedies are available to a purchaser at a tax sale, Ribeiro reads the cases discussing statutory remedies to mean no more than that a party suing under a statute must strictly comply with the provisions of that statute. (See *Bell v. County of Los Angeles* (1928) 90 Cal.App. 602, 605–606 [266 P. 291] (*Bell*).) In *Bell*, the tax-sale buyer sued for a refund when he learned the property was owned by the United States. (*Id.* at p. 603.) Former Political Code section 3898, subdivision 5(b), then provided for a refund where public property was

mistakenly sold, but the statute spoke of property "sold and conveyed." (Stats. 1917, ch. 547, § 1, p. 715; Stats. 1921, ch. 349, § 2, p. 477.) Because Bell had not paid certain amounts, no deed had been issued, that is, no conveyance had taken place. We denied recovery, finding Bell failed to "strictly comply" with the statutory conditions for relief. (90 Cal.App. at pp. 605–606.) The fact that a party must strictly comply with statutory provisions to qualify for a statutory remedy does not mean that other non-statutory remedies are available.

Before 1913, "the purchaser at a tax sale had no remedy against the county or state to recover money paid to the county or state at a tax sale." (*Coleman v. County of Los Angeles* (1919) 180 Cal. 714, 717 [182 P. 440] (*Coleman*); see *Holland, supra,* 162 Cal. at pp. 373–376; *Hayes, supra,* 99 Cal. at p. 79.) Therefore, we reject Ribeiro's first proposition, that a court before 1913 would have granted him rescission based on mistake. Caveat emptor would have barred his claim.

IV.

Legislative Amendments Providing Statutory Remedies in Limited Situations Did Not Abolish the General Rule of Caveat Emptor at Tax Sales

Ribeiro's second proposition is that legislative reform broadened remedies available to buyers. Ribeiro argues the statutes enacted beginning in 1913 and continuing through 1949 evidenced a legislative intent to broaden remedies to dissatisfied buyers.

He also notes that caveat emptor was eroded over time, and arose before contract law concepts began to enter real property law. (See, e.g., *Green v. Superior Court* (1974) 10 Cal.3d 616, 622–629 [111 Cal.Rptr. 704, 517 P.2d 1168] [abolishing common law rule and finding implied warranty of habitability in residential leases]; *Alexander v. McKnight* (1992) 7 Cal.App.4th 973, 977 [9 Cal.Rptr.2d 453] [Civ. Code, § 1102 et seq., mandating disclosure of defects in residential sales, makes caveat emptor "an anachronism"].)

One of the documents tendered by Ribeiro in his request for judicial notice is a 1912 report by the state controller, outlining in detail many inequities in the tax-sale system, and proposing statutory reforms. (Nye, Biennial Rep. of State Controller (1912) pp. 33–37.) Ribeiro mentions legislation in 1913, 1917, and 1939—the year the Revenue and Taxation Code was adopted—when the Legislature made a tax deed conclusive evidence of the regularity of proceedings except against fraud. (Stats. 1939, ch. 154, p. 1338, as amended by Stats. 1939, ch. 529, § 27, p. 1922.) He states that "by 1939,

the Legislature had clearly determined that a tax sale purchaser should *always* be provided a remedy whenever a tax sale is deemed void or unauthorized." He also mentions 1949 legislation enacting a version of section 3731, to allow a board of supervisors to invalidate a sale and refund the buyer. (Stats. 1949, ch. 247, § 3, p. 472.)

Ribeiro argues: "Through all of this historical analysis, one thing remains evident—at no point did the Legislature ever intend to impede on or exclude any remedies that might otherwise be available to tax sale purchasers. Indeed, the Legislature's intent in enacting these statutes was always to expand upon the remedies available to those who chose to bid at county tax sale[s]." Thus, he concludes the Legislature intended to preserve the remedy of rescission due to mistake.

Ribeiro turns history on its head. As we have explained, the remedy of rescission due to mistake was not available before 1913, therefore the Legislature could not have intended to preserve it. The reason the Legislature passed the various remedial statutes was to carve exceptions into the caveat emptor doctrine, but the Legislature did not abolish it. For example, in 1913, the Legislature amended former Political Code section 3898 to allow a buyer at a tax sale declared *void* to recover *from the former owner* "the full amount of taxes, penalties and costs paid" and *from the county* a "refund of the amount paid . . . as the purchase price of such property in excess of the amount for which he may have been reimbursed" by the former owner. (Former Pol. Code, § 3898, subd. 5, as amended by Stats. 1913, ch. 299, § 7, p. 560; see *Coleman, supra,* 180 Cal. at pp. 717–722 [describing the new statutory remedies].) The fact that statutes granting new remedies do not state they are exclusive is unimportant. Such a statement would be redundant because, absent a statute explicitly providing relief in the context of a tax sale, there is no remedy.

This does not add the concept of exclusivity to the Revenue and Taxation Code " 'under the guise of interpretation' " (*City of Sacramento v. Public Employees' Retirement System* (1994) 22 Cal.App.4th 786, 793–794 [27 Cal.Rptr.2d 545]) as Ribeiro asserts, it reflects the landscape on which the statutes grew. It is Ribeiro who seeks to add the idea that a network of equitable remedies underlies the Revenue and Taxation Code, ready to save those who cannot meet the limited statutory requirements for relief from tax sales. The legislative changes show an intent to ameliorate the doctrine in very limited situations, but not to abolish it, as the Legislature could easily do. Accordingly, we reject Ribeiro's second proposition, that legislative changes have effectively nullified caveat emptor.

V.

*Schultz* Was Wrongly Decided and Purchasers at Tax Sales
are Limited to Their Statutory Remedies

Ribeiro's third proposition is that *Schultz, supra*, 157 Cal.App.3d 242, was correctly decided, and explains why he should be able to seek rescission based on mistake. But as we explain, we decline to follow *Schultz* and conclude that the holdings in *Craland* and *Van Petten* were correct.

Schultz bought a parcel at a tax sale on which he planned to build a home, but successfully sued to rescind when he learned "the lot was unbuildable." (*Schultz, supra*, 157 Cal.App.3d 242, 244–245.) The *Schultz* majority allowed· recovery by holding that prior precedent applying the doctrine of caveat emptor was not binding. Specifically, the *Schultz* majority held that an action for rescission on the ground of mistake, as provided for in Civil Code section 1689, subdivision (b)(1), is an available remedy because the language of the provisions of the Revenue and Taxation Code does not indicate that the remedies therein are the *exclusive* means for a purchaser to recover. The majority also explained that the California Supreme Court's decision in *Routh v. Quinn* (1942) 20 Cal.2d 488 [127 P.2d 1] (*Routh*) was not applicable because *Routh* was based on provisions of the former Political Code which contained no warranties of the validity or regularity of tax sale proceedings. Finally, the *Schultz* majority opined that under the Restatement Second of Contracts, section 153, subdivision (a), rescission based on unilateral mistake is suitable because enforcement of the contract would result in a substantial burden on the purchaser. (*Schultz, supra*, at p. 250.)

Except for *Schultz*, California cases apply caveat emptor to tax sales. We are bound to follow those cases.

In *Routh*, a buyer of personalty sought damages against a tax assessor for negligence in computing the tax arrearages. (See Annot., Tax Officer—Personal Liability (1944) 149 A.L.R. 220 [*Routh* as the lead case].) The buyer had already lost a suit by the redeeming owner based on the invalidity of the tax sale. (*Routh, supra*, 20 Cal.2d 488, 489–490.) *Routh* stated the general rule, that "[t]he essence of [caveat emptor] is that the buyer beware; that he is bound to inform himself of the regularity of the tax proceedings, and that he assumes the risk of any error in the computation of the tax." (*Id.* at p. 493.) Although *Routh* involved a claim of negligence, the California Supreme Court held the caveat emptor doctrine "applies in all its vigor" at a tax sale. (*Id.* at p. 490.)

*Routh* also held that the statutory duty of an assessor to calculate the tax arrearages correctly is not a duty in favor of the buyer, but "only to the

public as an entity in making secure the public revenues and expediting the taxation process . . . . These conclusions with respect to the duty of care necessarily follow from the application of the doctrine of *caveat emptor* to the purchaser. While that doctrine relates to the existence of warranties in the sale of property, which, of course, are contractual in nature, it seems clear that if there are no warranties made by the state with reference to the regularity in computing the tax, there are none made by the assessor, the agent of the state. If they do not warrant or make any holding out as to the regularity of that computation, as to the purchaser, neither is under any duty of care with respect to him. As he is not entitled to any assurance of the regularity of the tax proceedings, he is not entitled to insist that due care be exercised by the assessor or the county. The statute does not impose such a duty upon him as to the purchaser." (*Routh, supra,* 20 Cal.2d at p. 492.)

In *People v. Chambers* (1951) 37 Cal.2d 552 [233 P.2d 557] (*Chambers*), a quiet title action by the state, the California Supreme Court reiterated that "in the absence of statute, a purchaser from the state or public agency at a tax sale cannot recover from the seller the purchase price paid or the taxes subsequently assessed even though the taxes were illegally assessed or levied, the property was not subject to taxation or the tax deed was void. [Citations.] Where a statute provides for recovery, that remedy is exclusive. [Citations.]" (*Id.* at p. 561.)

In 1989, the court in *Craland* rejected the *Schultz* holding. The property at issue was " 'underlain by a large landslide.' " (*Craland, supra,* 214 Cal.App.3d 1400, 1402.) Information concerning the property's geological status was contained in a review prepared before the sale by the engineering geology section of the county engineer design division, but was not known to the purchaser. (*Ibid.*) The purchaser sued to rescind the purchase and asserted that the defendants had breached their contractual duty, as knowing sellers, to disclose the landslide prior to the purchase based on the fact that the defendants owed the same duty as to ordinary sellers of real property to disclose all known, hidden defects. (*Id.* at pp. 1404–1405.) The court "refuse[d] to place the burden of searching [public] records on the State and County." (*Id.* at p. 1408.) Based on " '[t]he overwhelming body of decisional law governing tax sales,' " the court "disagree[d] with *Schultz*" and held that "neither the State nor the County owes a nonstatutory duty of care with respect to the purchaser." (*Id.* at pp. 1407, 1405.) Instead, "purchasers at a tax sale are limited to statutory remedies." (*Id.* at pp. 1407–1408.)

A few years later, the court in *Van Petten, supra,* 38 Cal.App.4th 43, reached the same conclusion. Van Petten sought rescission, alleging a brochure prepared before a tax sale misstated the property's assessed value. (*Id.* at pp. 44–46.) *Van Petten* rejected the *Schultz* majority and held that purchasers

of property at a tax sale are limited to statutory remedies. The court held that under the applicable statutes, "a purchaser at a tax sale is entitled to a refund of purchase money paid only where the court determines the tax deed is void (§ 3729) or the property 'should not have been sold' (§ 3731). There is no statutory remedy of rescission or refund based on . . . misrepresentation and breach of contract . . . ." (*Van Petten*, *supra*, 38 Cal.App.4th at p. 51.)

In response to the *Schultz* majority's attempt to disregard *Routh*, *Van Petten* explained in detail why *Routh* had not been superseded by subsequent legislation:

"The *Schultz* majority concluded the *Routh* caveat emptor holding was no longer viable because the former Political Code in effect when *Routh* was decided provided no warranties of the validity or regularity of tax sale proceedings, whereas sections 3725 through 3731, in the opinion of the *Schultz* majority, provide purchasers a remedy for an invalid or irregular tax sale. [Citation.] The implicit conclusion in *Schultz*'s analysis is that the current statutory scheme, unlike the former Political Code, *does* provide a warranty of the validity or regularity of tax-sale proceedings. Such conclusion, however, is unsupported by the language of sections 3725 through 3731.

"Sections 3725 and 3726 refer to a proceeding and defense, respectively, 'based on alleged invalidity or irregularity' of any tax-sale proceedings. However, these sections address only the limitations period within which such a proceeding or defense must be asserted; they do not provide a remedy for invalid or irregular proceedings as stated in *Schultz*. Sections 3728 through 3729 involve invalidity of tax *deeds*, and section 3731 addresses rescission of a tax sale of property which 'should not have been sold' (e.g., because it was owned by a governmental entity at the time of sale), without reference to invalidity or irregularity of the sale *proceedings*. We find nothing in these statutes which abrogates, as suggested by *Schultz*, the principle articulated in *Routh* that a purchaser of property at a tax sale takes the risk of any defect in the proceedings and is provided no warranty of the validity or regularity of the proceedings." (*Van Petten*, *supra*, 38 Cal.App.4th at p. 50.) We agree with the *Van Petten* court's explanation.

*Schultz*'s misreading of precedent also led it to misapply the remedy of rescission for mistake. *Schultz* wrongly concluded that cases such as *Bell*, *supra*, 90 Cal.App. 602, and *Chambers*, *supra*, 37 Cal.2d 552, were inapplicable because Schultz was suing based "on the common law right of rescission as codified in Civil Code section 1689." (*Schultz*, *supra*, 157 Cal.App.3d at p. 245.)

*Schultz* elaborated, stating: "Since a cause of action for rescission exists pursuant to a contract for sale of property between private parties (Civ. Code,

§ 1689), rescission is similarly available pursuant to a sale from a public entity to a private party. 'The California cases uniformly refuse to apply special rules of law simply because a governmental body is a party to a contract. [Citations.]' (*M. F. Kemper Const. Co. v. City of L. A.* (1951) 37 Cal.2d 696, 704 [235 P.2d 7]; see also Civ. Code, § 1635.) Governmental agencies must also contract equitably." (*Schultz, supra,* 157 Cal.App.3d at p. 247.) Civil Code section 1635, cited by *Schultz* and unchanged since the adoption of the Civil Code in 1872, provides that "[a]ll contracts, whether public or private, are to be interpreted by the same rules, except as otherwise provided by this Code." (See Ann. Civ. Code (1st ed. 1872, Haymond & Burch, Commrs.-annotators) § 1635, p. 304.) It addresses the interpretation of contracts, not substantive contract rules. *M. F. Kemper Const. Co. v. City of L. A., supra,* 37 Cal.2d 696, also cited by *Schultz,* involved whether, after cancellation of a public works bid due to mistake, the bidder would forfeit a bond. *Kemper* applied the general rule of construction that disfavors interpretations leading to forfeitures. (*Kemper, supra,* 37 Cal.2d at p. 705; in part citing *Petrovich v. City of Arcadia* (1950) 36 Cal.2d 78, 85 [222 P.2d 231] [forfeitures disfavored, even in public contracts].) *Kemper* also applied the rule that relief from unilateral mistake was permitted. (*Kemper, supra,* 37 Cal.2d at p. 701.) Thus, while normal contract rules may apply to government contracts generally, neither of the authorities cited by *Schultz* supports the view that caveat emptor no longer applies to tax-sale contracts. As stated by the *Craland* court rejecting *Schultz,* "Although a tax sale admittedly constitutes a contract, the California courts . . . have not applied ordinary contract law to determine the rights of the purchaser against the seller." (*Craland, supra,* 214 Cal.App.3d at p. 1405.)

Civil Code section 1689 codifies grounds for rescission, including the right to rescind "[i]f the consent of the party rescinding . . . was given by mistake, . . . exercised by or with the connivance of the party as to whom he rescinds, or of any other party to the contract jointly interested with such party." (Civ. Code, § 1689, subd. (b)(1).) This language was in the original 1872 Civil Code. (See Ann. Civ. Code, *supra,* § 1689, p. 311.)

We agree with Ribeiro that Civil Code section 1689 was not abrogated by the Revenue and Taxation Code, but that does not mean it can be applied to evade the caveat emptor doctrine applicable to tax sales. Most of the California cases we have cited postdate Civil Code section 1689, and if a general right to rescission had been available, there would have been no need for most of those buyers to invoke statutory remedies, nor need for the remedial legislation. A claim of rescission due to mistake cannot coexist with caveat emptor.

*Schultz* followed the Restatement Second of Contracts, section 153, in holding a unilateral mistake of fact was sufficient despite the "outward

manifestations of the parties," so long as the party "does not bear the risk of the mistake under the rule stated in § 154." (*Schultz, supra,* 157 Cal.App.3d at p. 249, quoting Rest.2d Contracts, § 153; see *Donovan v. RRL Corp.* (2001) 26 Cal.4th 261, 280–282 [109 Cal.Rptr.2d 807, 27 P.3d 702] [adopting Restatement view of unilateral mistake].) In doing so *Schultz* had to view caveat emptor as a nullity, as we explain.

The Restatement exception section provides:

"A party bears the risk of a mistake when

"(a) the risk is allocated to him by agreement of the parties, or

"(b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or

"(c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so." (Rest.2d Contracts, § 154.)

In a footnote without cogent analysis, *Schultz, supra,* 157 Cal.App.3d 242, read the Restatement exception too narrowly, by stating Schultz wanted to build a home, he was not "speculating as to the existence of oil beneath the surface." (*Id.* at p. 249, fn. 1.) But many cases apply subdivision (a) to bar buyers at "as is" or caveat emptor property sales from obtaining rescission based on mistake or misrepresentation. (Rest.2d Contracts, § 154(a); *Holly Hill Holdings v. Lowman* (1993) 226 Conn. 748, 757 [628 A.2d 1298, 1303]; *First Trust Co. v. Reinhardt* (1982) 3 Haw.App. 589, 591–593 [655 P.2d 891, 893–894]; *Lenawee County Bd. of Health v. Messerly* (1982) 417 Mich. 17, 29–32 [331 N.W.2d 203, 209–211].) Further, subdivision (b) states an exception where a party "is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient." (Rest.2d Contracts, § 154(b); see *Geodyne Energy Income Production Partnership I-E v. Newton Corp.* (Tex. 2005) 161 S.W.3d 482, 490; cf. *Pacelli Brothers Transportation, Inc. v. Pacelli* (1983) 189 Conn. 401, 408–409 [456 A.2d 325, 329] [rule not applied between fiduciaries].) Ribeiro fits within both of these exceptions, because he knew the sale was "buyer beware" and he knew he was acting on incomplete information about the 1915 bond arrearages.

██ Thus, *Schultz* could only reach its result by disregarding the unbroken line of California Supreme Court cases applying caveat emptor to tax sales. (E.g., *Chambers, supra,* 37 Cal.2d 552; *Routh, supra,* 20 Cal.2d 488; *Holland, supra,* 162 Cal. 366.) We are bound to follow those cases. (*Auto Equity Sales,*

*Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) As stated by the dissenting opinion in *Schultz*: "Nothing has changed California's law on tax sales as pronounced by our Supreme Court over 40 years ago 'that in tax sales the doctrine of *caveat emptor* applies in all its vigor.' " (*Schultz, supra,* 157 Cal.App.3d at p. 252 (dis. opn. of King, J.).)

■ California Supreme Court precedent has not changed in the 25 years since *Schultz* was decided. Accordingly, we reject Ribeiro's third proposition, that *Schultz* was correctly decided, and agree with the dissenting opinion in *Schultz*, and with *Craland* and *Van Petten*, that there is no relief for a buyer at a tax sale who has made an unwise bid based on incomplete or incorrect information.

## DISPOSITION

The judgment is reversed with directions to enter judgment for the County. Johnny R. Ribeiro shall pay El Dorado County's costs of this appeal. (Cal. Rules of Court, rule 8.278(a)(2).)

Blease, Acting P. J., and Nicholson, J., concurred.

Respondent's petition for review by the Supreme Court was denied August 24, 2011, S194102.